Jami L. Pannell, OSB #06429
Animal Law Clinic
Lewis & Clark Law School
10015 SW Terwilliger Boulevard
Portland, OR 97219-7799
Telephone:  503.768.6848
Facsimile:  503.768.6917
Email:        anmlclin@lclark.edu

Shauna Curphey, OSB #06306
Northwest Constitutional Rights Center
520 SW Sixth Avenue, Suite 1050
Portland, OR 97204
Telephone:  503.295.6400
Facsimile:  503.295.6415
Email:        scurphey@nwcrc.org

Attorneys for Defendant Kevin Mieras

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| GREGG SCHUMACHER and LINDA SCHUMACHER, individually and as husband and wife, and GREGG SCHUMACHER FURS LLC dba SCHUMACHER FURS & OUTERWEAR, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CV 07-00601-MO |
| CITY OF PORTLAND, a municipal corporation; IN DEFENSE OF ANIMALS, a foreign nonprofit corporation; ANIMAL LIBERATION FRONT, an unincorporated association; PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., a foreign nonprofit corporation; MATT ROSSELL; KEVIN MIERAS aka "Bluejay"; CONNIE DURKEE; ALEX LILLI; JOHN DOES 1-10; and JANE DOES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) | DEFENDANT KEVIN MIERAS' MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION OF INJUNCTIVE ORDER DATED MAY 22, 2007 |
| Defendants. | ) ) | |

## I.    PROCEDURAL HISTORY

On May 17, 2007, defendants IDA, Rossell, Durkee and Mieras filed their Response to Plaintiffs' Motion for Preliminary Injunction, requesting that the Court deny Plaintiffs' Motion for Preliminary Injunction ("Motion").  After briefing by the parties and oral argument, Judge Mosman issued his Order dated May 22, 2007 ("Order").  The Order partially granted plaintiffs' Motion, but only as to defendant Kevin Mieras ("Mr. Mieras"), and denied plaintiffs' Motion as to the remaining defendants.

## II.    ARGUMENT

Mr. Mieras now requests that the Court reconsider its Order pursuant to FRCP 60(b).  The Order: (1) is manifestly unjust; (2) unduly burdens Mr. Mieras' First Amendment right to free speech; (3) contains language and restrictions that are so vague and ambiguous Mr. Mieras cannot comply with most of its provisions; (4) contains the erroneous finding that plaintiffs demonstrated a likelihood of success on their Intentional Infliction of Emotional Distress ("IIED") claim, and possibly other claims, against Mr. Mieras; (5) contains the erroneous finding that plaintiffs met their burden of showing irreparable injury if Mr. Mieras were not enjoined; (6) enjoins Mr. Mieras from conduct he never did, was never accused of doing, or threatening to do; (7) contains insufficient factual evidence supporting the preliminary injunction imposed upon Mr. Mieras; (8) failed to account for the public's interest, as well as the hardship that would be imposed upon Mr. Mieras as a result of the preliminary injunction. For these reasons, Mr. Mieras respectfully requests that the Order be vacated.

### A.    Per FRCP 60(b), This Court Has Authority To Reconsider Its Order.

Under FRCP 60(b), the Court has discretion to reconsider its Order upon the motion of a party.  The Court may reconsider its Order for a number of reasons, including newly-discovered evidence, or any other reason that justifies relief.  Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law. *School District No.*

*1J, Multnomah County, Oregon v. AC and S, Inc*., 5 F.3d 1255, 1263 (9th Cir. 1993).  Mr. Mieras

requests reconsideration of the Order based on evidence he discovered after the Order was imposed,

and because the Order is manifestly unjust for the reasons set forth below.

First, Mr. Mieras realizes that the Court has not seen an accurate portrayal of the anti-fur

demonstrations as they normally are, and specifically, Mr. Mieras' involvement in the demonstrations,

and this may leave the Court with a mistaken impression that the Schumachers, their employees and

family members might require protection from Mr. Mieras.  Second, Gregg Schumacher submitted his

Supplemental Declaration the day prior to the hearing on these issues, and Mr. Mieras did not have the

opportunity to address the new allegation against him prior to the hearing.  Third, after the hearing, Mr.

Mieras discovered video footage that supports the arguments he sets forth in this Memorandum.  Fourth,

the plaintiffs claim that they are in fear of Mr. Mieras, but there is evidence that shows the opposite is

true, that the Schumachers and their employees were in fact the people to fear. These contentions are

addressed below.

### B.    The Order Unduly Burdens Mr. Mieras' First Amendment Right To Free Speech.

The First Amendment reflects a "profound national commitment to the principle that debate on

public issues should be uninhibited, robust, and wide-open." *Boos v. Barry*, 485 U.S. 312, 318 (1988)

(citing *New York Times Co. v. Sullivan*, 376 U. S. 254, 270 (1964)).  As a result, the Supreme Court has

"consistently commented on the central importance of protecting speech on public issues." *Id.*   The

First Amendment prohibits overly broad government restrictions that reach protected speech activity.

*See City Council v. Taxpayers for Vincent*, 466 U.S. 789, 798-99 (1983).  In addition, restrictions on

speech conducted on public streets and sidewalks must be "very limited," because sidewalks and streets

are "traditional public fora that for time out of mind, have been used for purposes of assembly,

communicating thoughts between citizens and discussing public questions."  *Id.*  In such fora, the State

may impose content-neutral injunctions restricting the time, place, and manner of expression only if the

"provisions of the injunction burden no more speech than necessary to serve a significant government

interest." *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994).

Here, the injunction against Mr. Mieras prohibits him from "directing any form of communication, orally or in writing, to Gregg or Linda Schumacher, their family members, or employees of Schumacher Furs."  The ethical treatment of animals is undoubtedly a public issue.[1] Despite this, the injunction reaches "any form of communication" and so is not limited to unprotected speech, such as fighting words or incitement. S*ee Chaplinsky v. New Hampshire,* 315 U.S. 568 (1942); *Terminiello v. Chicago*, 337 U.S. 1 (1949). Moreover, because the injunction is not limited geographically, it regulates speech in a traditional public forum: the sidewalk in front of the Schumacher Furs store.  Thus, the injunction prohibits protected First Amendment activity, such as holding a sign or chanting a slogan in front of the Schumacher store, insofar as one of the Schumachers, their employees or family members are likely to see and hear these communications. As a result, this portion of the injunctive Order should be vacated as overly broad.

The Order similarly fails to meet the test for a reasonable time, place and manner injunction because it burdens more speech than necessary to serve a significant government interest. The injunction does not explicitly indicate the government interest it serves.  During oral argument, the Court expressed concern that Mr. Mieras' alleged act of calling out "Hey, Gregg!  Hey, Gregg!" at Mr. Schumacher's residence was not a neutral encounter.   In addition, the Court's Order granting the preliminary injunction states that Mr. Mieras attempted to intimidate the Schumachers through verbal and written communication.   Thus, the Court presumably enjoined Mr. Mieras' from directing any form of

---

[1] The numerous press reports on the Schumacher Fur store activities demonstrate that it is a matter of public concern. *See, e.g.,* Joseph Rose, *Furrier will close, blames protesters*, The Oregonian, Feb. 20. 2007, available at http://www.oregonlive.com/oregonian/stories/index.ssf?/base/news/1171943730278200.xml&coll=7 (last visited May 23, 2007); Joseph Rose, *Fur Fight,* The Oregonian, Jan. 18, 2007, available at
http://www.oregonlive.com/oregonian/stories/index.ssf?/base/portland_news/1168903510300280.xml&coll=7 (last visited May 23, 2007); Spencer Heinz, *Fur store eviction: Go now, not later,* The Oregonian, Dec. 23, 2006, available at http://www.oregonlive.com/oregonian/stories/index.ssf?/base/news/116684793116980.xml&coll=7 (last visted May 23, 2007); Seth Prince & Spencer Heinz, *Activist looks beyond fur shop's move,* The Oregonian, Nov. 30, 2006, available at http://www.oregonlive.com/oregonian/stories/index.ssf?/base/portland_news/1164995712314880.xml&coll=7 (last visited May 23, 2007); Seth Prince & Spencer Heinz, *Fur store said it's had enough,* The Oregonian, Nov. 29, 2006, available at http://www.oregonlive.com/oregonian/stories/index.ssf?/base/news/116478159947400.xml&coll=7 (last visited May 23, 2007).

communication to the Schumachers and their employees on that basis.

"The ability of government […] to shut off discourse solely to protect others from hearing it is […] dependent on a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen v. California*, 403 U.S. 15, 21 (1971).  Moreover, the reasonableness of a time, place and manner restriction depends on "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."  *Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972); *Portland Feminist Women's Health Center v. Advocates for Life, Inc.*, 859 F.2d 681, 686-87 (9th Cir. 1988).  Thus, while a court may regulate disruptive speech insofar as it threatens normal activity at a location, it may not go farther than is necessary to achieve that end. *Portland Feminist Women's Health Center*, 859 F.2d at 686-87.

In *Portland Feminist Women's Health Center*, the Ninth Circuit considered whether an injunction that prevented protestors outside an abortion clinic from screaming, chanting or yelling was narrowly tailored to serve the government's significant interest in protecting the ability of the clinic to provide medical services.  *Id.*  The court found that the injunction was not narrowly tailored because, though such conduct may be unpleasant, it would not materially affect the government interest unless it disrupted the provision of services.  *Id.*  As a result, the court modified the injunction so that it only prohibited screaming, chanting or yelling "in a volume that substantially interferes with the provision of medical services."  *Id.* at 687.

Similarly, in *Schenck v. Pro-Choice Network*, the Supreme Court struck a portion of an injunction that established "floating buffer zones," which required protestors to stay fifteen feet away from individuals entering and leaving abortion clinics. 519 U.S. 357, 377 (1997).  The Court reasoned that it would be difficult for a protester to remain in compliance with the injunction, when a protestor could not predict when a person seeking to enter or leave the clinic would walk by while the protestor was engaged in peaceful expressive activity.  *Id.* at 388. As a result, the Court held that the buffer zone burdened more speech than necessary because a protestor who attempted to stand 15 feet from someone

entering or leaving a clinic and to peacefully communicate a message risked the violating the injunction. *Id.*

The injunction here stands in stark contrast to the careful approach in *Portland Feminist Women's Health Center* and *Schenck*. Here, there is no evidence that substantial privacy interests demand enjoining Mr. Mieras from "directing any form of communication" to the Schumachers and their employees, nor is there evidence that such a restriction is needed to protect normal activity at the store. In addition, as noted above, the restriction threatens protected First Amendment activities, and that in itself is manifestly unjust. Thus, this portion of the injunction fails as an invalid time, place and manner restriction because it does not serve a significant government interest, or in the alternative, because it restricts more speech than necessary.

### C.  Because the Order Enjoining Mr. Mieras Is Vague and Uncertain, Mr. Mieras Cannot Readily Comply With the Majority of Its Terms.

"Every order granting an injunction . . . shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed. R. Civ. Proc. 65(d). This rule serves to "prevent the uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Portland Feminist Women's Health Center v. Advocates for Life, Inc.* 859 F.2d 681, 685 (9th Cir. 1988) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). Thus, the language of injunctions "must be reasonably clear so that ordinary persons will know precisely what action is proscribed." *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985) (altering injunction in favor of the enjoined individual because the injunction was internally inconsistent).

The portion of the Order pertaining to Mr. Mieras reads, in pertinent part:

> IT IS HEREBY ORDERED that Kevin Mieras, and persons in active concert or participation with him who receive actual notice of the order by personal service or otherwise, are temporarily enjoined and restrained in any manner and by any means from:
>
> > Approaching closer than 15 feet from any entrance to Schumacher Furs store;

Entering Schumacher Furs store;

Placing any signs on Shumacher Furs store, or within 15 feet of any entrance to Schumacher Furs store;

Placing any solid or liquid substances on or around Schumacher Furs store;

Directing any form of communication, orally or in writing, to Gregg or Linda Schumacher, their family members, or employees of Schumacher Furs;

Physically touching Gregg or Linda Schumacher, their family members, or employees of Schumacher Furs;

Entering on the residential property of Gregg or Linda Schumacher, their family members, or employees of Schumacher Furs.

Order at 2.

This language creates uncertainty and confusion, and its vagueness raises a series of questions: What does it mean to be a "person in active concert or participation with" Mr. Mieras? Clearly, that cannot include *all* of the protesters who have received actual notice of the injunction Order; specifically, the other named protester defendants who were represented by counsel at the preliminary injunction hearing. It is not clear, then, who this provision applies to. What is meant by "directing any form of communication"? Mr. Mieras realizes this means verbal communication specifically addressing the specified persons, but does it also include anti-fur signs those persons might see, but are meant for the general public? Does it include sidewalk chalk writings the specified persons might see, but are directed toward the general public? Does it include anti-fur chants or slogans? Does the Order pertain only to the current location of Schumacher Furs, or does it extend to any new locations that may be opened prior to resolving this case? Does the "solid substances" provision include sidewalk chalk? Does the "solid or liquid substances" provision include bringing food and beverages to the demonstrations in front of the Schumachers' store? What area does "around Schumacher Furs store" encompass? If the solid/liquid substances provision applies to food and drink, how far away from the

store must Mr. Mieras' food and drink be if he is to comply with this provision?

As to the specified persons mentioned, Mr. Mieras is able to identify Gregg and Linda Schumacher, but he only knows some of Schumachers' employees by sight, and is unable to identify *any* of the Schumachers' family members by sight. Without photographs identifying all of the Schumachers' employees and family members, Mr. Mieras could easily, but inadvertently, violate the terms of the Order by unknowingly communicating with these unidentified employees or family members. In addition, without knowing the residential address of Gregg and Linda Schumacher, or the residential addresses of their employees and family members, again, Mr. Mieras may inadvertently violate the terms of the Order by unknowingly entering the residential property of one or more of the named subjects. Aff. of Kevin Mieras. Mr. Mieras realizes that the Court would not likely order plaintiffs to provide photographs and residential addresses, which is why he instead requests the Order be vacated. Without photo identification and residential addresses, it appears impossible to state with specificity where Mr. Mieras cannot go and with whom he cannot communicate.

Due to the vague and uncertain terms of the Order, this places a great mental stress and emotional burden upon Mr. Mieras, as he does not want to violate the terms of the Order. Due to Mr. Mieras' lack of knowledge as to the identities of most of these specified persons and all of their respective residences, the practical result is that Mr. Mieras is enjoined from moving about freely in the greater Portland metropolitan area as well as enjoined from "any form of communication" with any person he does not know; otherwise, he may violate the terms of the Order. This uncertainty is manifestly unjust. Therefore, at a minimum, the Order should be vacated with respect to these vague and ambiguous conditions and persons.

D.    **Plaintiffs Did Not Meet Their Burden to Establish That a Preliminary Injunction Was Warranted Against Mr. Mieras.**

A plaintiff seeking a preliminary injunction must demonstrate either 1) a likelihood of success on the merits and a possibility of irreparable injury, or 2) the existence of serious questions on the merits and a balance of hardships tipping in its favor. *Clear Channel Outdoor Inc., a Delaware Corp. v. City*

*of Los Angeles*, 340 F.3d 810 (9th Cir. 2003); *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992). These two legal standards are not distinct.  Rather, they represent extremes of a single continuum in which the required degree of irreparable harm increases as the probability of success on the merits decreases. *Id.; Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1389 (9th Cir. 1988). However, even if the balance of hardships tips decidedly in favor of the moving party, that party must show "as an irreducible minimum that there is a fair chance of success on the merits." *Stanley v. University of Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1994).  Finally, in cases where the public interest is involved, the district court must also examine whether the public interest favors the moving party. *Fund for Animals, Inc.,* 962 F.2d at 1400.

The Order states that the plaintiffs satisfied the showing required in the *Clear Channel* case. However, the plaintiffs did not make a prima facie showing of *any* of their claims against Mr. Mieras. Plaintiffs cannot have a likely *or* fair chance of success on the merits where they do not offer evidence as to each element of each claim.  Moreover, there is no evidence the public interest was considered here.  Animal rights constitute an issue of public interest.  *See International Primate Protection League v. Administrators of Tulane Educational Fund*, 500 U.S. 72 (1991); *Cetacean Community v. Bush*, 386 F.3d 1169 (9th Cir. 2004) (addressing animal rights as an issue of public interest).  In addition, "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."  *Sammartano v. First Judicial District Court*, 3030 F.3d 959, 974 (9th Cir. 2002).

## 1. <u>Plaintiffs Did Not Meet Their Burden of Showing a Likelihood of Success on the Merits on Their IIED Claim, or Any Other Claim, Against Mr. Mieras.</u>

Plaintiffs bear the burden of showing a strong likelihood of success on the merits of their claims. *Johnson v. California State Board of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995).  A preliminary injunction should not be granted in a doubtful case. *Barrett v. Smith*, 530 F.2d 829 (9th Cir. 1975); *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir. 1970), aff'd, 405 U.S. 727 (1972). To effectively negate a movant's allegations, it is sufficient when the non-moving party offers testimony that the conduct

complained of never occurred and never will occur.  *Boyd v. Beck*, 404 F. Supp. 2d 879 (E.D. N.C. 2005).

Here, the Order states that "…plaintiffs satisfied the showing […] of likelihood of success on the merits of one or more of their common law claims against Mieras, such as intentional infliction of emotional distress…"  Order at 1.  Therefore, this portion of the memorandum focuses on the plaintiffs' intentional infliction of emotional distress claim.

"To state a claim for intentional infliction of severe emotional distress, a plaintiff must plead that (1) the defendant <u>intended</u> to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the <u>cause</u> of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an <u>extraordinary transgression of the bounds of socially tolerable conduct</u>." *Sheets v. Knight,* 308 Or. 220, 236 (1989). To satisfy the intent element of IIED, a plaintiff must allege that the defendant acted with the purpose of inflicting severe emotional or mental distress on the plaintiff. "It is not enough that [the defendant] intentionally acted in a way that causes such distress." *Patton v. J.C. Penney Co.,* 301 Or. 117, 122 (1986).

As to extraordinary transgressions of the bounds of socially tolerable conduct, this signifies extreme and outrageous conduct.  For example, the alleged conduct of a police officer, who told the defendant that he was "crazy as a bedbug" and that the officer was going to put the defendant in an insane asylum and take away his children, did not constitute extreme and outrageous conduct. *Pakos v. Clark,* 253 Or. 113, 132 (1969).  Even the actions of teacher in striking a student across the head with a book, causing his cornea to be cut by a folder, were not sufficiently extreme and outrageous to support the student's claim for the tort of outrage. *Daniels v. Lutz*, 407 F. Supp. 2d 1038 (E.D. Ark. 2005).

     i.   <u>Plaintiffs Lack Evidence That Mr. Mieras Ever Engaged in Tortious Conduct.</u>

Here, the Order states that the Court "…credited plaintiffs' claims and evidence that Mieras followed plaintiffs to their residence, attempted to intimidate them through verbal and written communication, and trespassed upon Schumacher Furs store."  Order at 1.

PAGE 10 – DEFENDANT KEVIN MIERAS' MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION OF INJUCTIVE ORDER DATED MAY 22, 2007

The evidence plaintiffs offered does not support these findings.  The plaintiffs did not present allegations or evidence that Mr. Mieras *followed* them to their residence, nor that he attempted to *intimidate* them, whether through oral or written communication.  The plaintiffs claimed that Mr. Mieras came inside the fur store, just as they claimed against all of the other defendants, and Mr. Mieras denied that claim.  Complaint; Aff. of Kevin Mieras.  The plaintiffs offered no evidence of that assertion, nor did they ever claim to *see* Mr. Mieras in their store.

Gregg Schumacher made only two specific allegations against Mr. Mieras, that: (1) Mr. Mieras continues to verbally taunt him, and (2) in February 2006 he heard a voice call out from about half a block from the Schumachers' residence, "Hey Gregg!  Hey, Gregg!", and the voice sounded to him like the voice of Mr. Mieras.  Decl. of Gregg Schumacher; Supp. Decl. of Gregg Schumacher.  Mr. Mieras began attending the protests at Schumacher Furs in mid-February 2006, and did not know Gregg Schumacher by appearance at that time.  Aff. of Kevin Mieras; Supp. Aff. of Kevin Mieras.  In addition, since Mr. Mieras began attending the protests during the same timeframe Mr. Schumacher alleges that the statement was made, it is highly unlikely that Mr. Schumacher could have known Mr. Mieras' voice well enough to have recognized it.

As to the continuing verbal taunts Mr. Schumacher alleges, Mr. Mieras only recalls one comment he made to Gregg Schumacher in the weeks prior to the motion for preliminary injunction; namely, "See you next week, Gregg" as Mr. Schumacher left his store.  Supp. Aff. of Kevin Mieras.  This comment was uttered at one of the regular Saturday protests in Mr. Mieras' normal speaking voice.  *Id*.  A man who lives above the Schumacher Furs store has seen Mr. Mieras at the protests approximately 55 to 70 times.  Aff. of Jason Dahl.  Never once in all of those instances did this man see Mr. Mieras threaten anyone, shout profanities at anyone, engage in acts of vandalism, try to enter the store, physically touch anyone, or engage in rowdy conduct of *any kind* while in front of the Schumacher Furs store.  *Id.*

Again, the Schumachers are claiming they need protection from an activity that they themselves

engage in.  They never alleged that Mr. Mieras followed them home, yet that language appeared in the Order.   Attached to Linda Schumacher's own Declaration was an email exchange between Police Commander Dave Benson and City Commissioner Randy Leonard, in which Mr. Benson states: "Greg [sic] Schumacher has responded [to the demonstrations] by hiring security and camera folks to film the protests and even follow some of the protestors to their cars[,] jotting down license plate numbers and on one occasion following a protestor to their residence and recording their address."   Exhibit 2-b attached to Decl. of Linda Schumacher.  The Schumachers hire people to follow protesters, yet they claim they need protection from Mr. Mieras, a man they allege said, "Hey, Gregg!  Hey, Gregg!" a half a block away from their home over 16 months ago?  The Schumachers are not in need of a protective order against Mr. Mieras, as shown by their lack of evidence supporting such a contention and Mr. Mieras' own evidence that the Schumachers do not fear him, and are not in need of "immediate" protection.

ii.   Mr. Mieras' Alleged Conduct Does Not Amount to Extreme or Outrageous Behavior

In their Complaint, Plaintiffs further allege that "the conduct of the protestors and demonstrators as alleged herein constitutes an extraordinary transgression of socially tolerable conduct."  Complaint at 8-9.  However, the two statements in question ("Hey, Gregg!  Hey, Gregg!", which was *not* uttered by Mr. Mieras, and "See you next week, Gregg", which *was* uttered by Mr. Mieras) cannot possibly constitute an *extraordinary* transgression of the bounds of socially tolerable conduct.

The law expects people to deal with annoyances and insults as an ordinary part of life. Actionable conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 (1965). The defendant's conduct must be more than malicious and intentional; and liability does not extend to mere *insults, indignities, threats, annoyances, or petty oppressions*. *Viehweg v. Vic Tanny Intern. of Missouri, Inc.*, 732 S.W.2d 212, 213 (Mo.App.1987) (emphasis added).   The court must determine whether an average member of the

community upon learning of the facts alleged by plaintiff would exclaim "outrageous!"  *Viehweg,* 732 S.W.2d at 213. *See also Brewer v. Erwin,* 287 Or. 435, 458-60 (1979) (landlord's attempt to frighten tenant out of apartment by disconnecting utilities, acting in threatening manner, and demolishing part of building while tenant was residing in it could constitute intentional infliction of severe emotional distress); *Babick v. Oregon Arena Corp.* 333 Or. 401, 413 (2002) (holding, in part, an allegation that defendants released "intoxicated and violent" concertgoers that had been detained by plaintiffs, who were concert security guards, thereby presenting a threat of imminent physical harm to plaintiffs, supported a claim for IIED).

> iii.   The Plaintiffs Presented No Evidence That They Suffered Severe Emotional Distress and Evidence Submitted by Mr. Mieras Demonstrates That His Alleged Conduct Did Not Cause Distress

The Plaintiffs allege that "the protestors' and demonstrators' conduct […] was intended to and has actually caused extreme fear, horror, anger and humiliation to plaintiffs Gregg Schumacher and Linda Schumacher, all to their damage in an amount not less than $500,000."  Complaint at. 9. However, plaintiffs have not presented any evidence, as to Mr. Mieras, as to *any* of these broad allegations.  Instead, Mr. Mieras has presented evidence that suggests the plaintiffs do not fear him at all, and actually seek to intimidate him.

Plaintiffs did not allege Mr. Mieras was in the video or photo exhibits attached to Gregg Schumacher's Declaration, so Mr. Mieras did not think a response was required of him initially as to these exhibits.  Mr. Mieras is shown in only two of the photos attached to Gregg Schumacher's original Declaration; specifically, the bottom two photographs shown in Exhibits 2-b and 2-c.  Supp. Aff. of Kevin Mieras; Exhibit B.  In addition, Mr. Mieras is shown in only a small portion of the videotape attached to Gregg Schumacher's original Declaration; specifically, on or about the 8-minute, 33-second mark through the 9-minute mark in Exhibit 1.  *Id.*; Exhibit C.  These exhibits show Mr. Mieras' subdued, typical, and consistent behavior at the demonstrations, and show that he remained calm even when the protests were at their most sensational peaks.

Gregg Schumacher has verbally engaged Mr. Mieras on a number of occasions since the protests began, and on November 18, 2006, he went out of his way to step on Mr. Mieras' foot as he was leaving the fur store.  Supp. Aff. of Kevin Mieras.  Similarly, Linda Schumacher has verbally engaged Mr. Mieras on a number of occasions, including the verbal exchange captured on video where she told Mr. Mieras she knew where he shopped, and taunted Mr. Mieras about being a hypocrite for allegedly shopping at a store that sells meat when he is a vegan.  Supp. Aff. of Kevin Mieras; Exhibit A.  It is unclear how Linda Schumacher could know where Mr. Mieras shops, but she assures him she knows. *Id.*  This videotaped encounter with Ms. Schumacher was filmed in late November 2006, ten months after the alleged nighttime home visit.  Supp. Aff. of Kevin Mieras.  One of the widely-known taunts from the Schumachers was illustrated in the affidavit of a co-defendant, which included a photograph of a poster in the Schumacher Furs store window that read: "All protesters should be beaten, strangled, skinned alive, anally electrocuted."  Exhibit A attached to Aff. of Matt Rossell.  It is quite a stretch that the Schumachers claim they fear Mr. Mieras when they confront him in such ways.

Also, a male employee of Schumacher Furs cannot claim to be afraid of Mr. Mieras when he forcefully and verbally engaged him outside of the store just last month.  *Id.*; Exhibit A.  Video footage shows this Schumacher employee calling Mr. Mieras a "pussy" and a "faggot" and shoving his camera in Mr. Mieras' face.  *Id.*

Finally, a third video clip of a different male employee of Schumacher Furs shows this employee forcefully engaging Mr. Mieras outside of the store.  *Id.*  This employee points his finger very close to Mr. Mieras' face.  *Id.*  These examples are clearly not acts of people who fear Mr. Mieras, and they certainly do not need court-ordered protection from him in the form of a preliminary injunction.

If *any* conduct comes close to an extraordinary transgression of the bounds of socially tolerable conduct, it is the type of conduct the Schumachers and their employees directed at Mr. Mieras.  Here, there exists an adversarial relationship between the anti-fur protesters and the fur salon owners.  The Schumachers have likely suffered insults, indignities and annoyances as a result of the conflict.  Such

injuries, however, are commonplace in a society that allows open and robust debate on public issues. *See Terminiello v. Chicago,* 337 U.S. 1, 4 (U.S. 1949). They do not amount to intentional infliction of emotional distress.

### 2. Plaintiffs Did Not Meet Their Burden of Showing the Possibility of Irreparable Injury If A Preliminary Injunction Were Not Issued Against Mr. Mieras.

A party seeking an injunction must demonstrate that they will be exposed to some significant risk of irreparable injury. *Cairns v. Franklin Mint Co*., 24 F. Supp. 2d 1013 (C.D. Cal. 1998). "The temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Los Angeles Memorial Coliseum v. National Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). Though the Ninth Circuit has recognized that emotional and psychological injury can constitute irreparable harm, it upheld a preliminary injunction where the harm was *immediate*. *Chalk v. United States District Court*, 840 F.2d 701, 709-10 (9th Cir. 1988). Moreover, even if the Court finds that the plaintiffs have carried their burden of demonstrating irreparable harm, the plaintiffs must also show that the harm was caused by the wrongful conduct of the individual they seek to enjoin. *See Stanley v. University of Southern California*, 13 F.3d 1313, 1324 (9th Cir. 1994).

Here, plaintiffs allege numerous wrongful acts committed by the so-called "mob", and that they suffered emotional distress as a result, but they failed to demonstrate why a preliminary injunction was warranted as to Mr. Mieras' specific conduct. The alleged "Hey, Gregg! Hey, Gregg!" statement occurred approximately sixteen months ago, which indicates the plaintiffs do not need protection from "immediate" harm. Decl. of Gregg Schumacher. The Schumachers, their employees and their customers have themselves taunted Mr. Mieras on numerous occasions long after this alleged statement was made, which indicates they were not in fear of Mr. Mieras. Supp. Aff. of Kevin Mieras; Exhibit A. Thus, even if the plaintiffs suffered emotional distress during the eighteen months of demonstrations in front of the Schumacher store, any such distress cannot be attributed to the conduct of Mr. Mieras. In sum, plaintiffs failed to meet their burden as to Mr. Mieras under this prong of the test.

### E. The Order Should Be Vacated Per FRCP 52(a) Because There Is Insufficient Factual

**<u>Evidence to Support the Preliminary Injunction</u>.**

Under FRCP 52(a), findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed. R. Civ. P. 52(a). A preliminary injunction must be supported by sufficient factual evidence and a sufficient basis must be articulated by the district court in the order granting the injunction. *Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572 (D.C. Cir. 1990) (holding there was no factual basis sufficient to support findings necessary to grant preliminary injunction). In issuing a preliminary injunction, a district court abuses its discretion by basing its decision on either an erroneous legal standard or *clearly erroneous factual findings*. *Walczak v. EPL Prolong, Inc.,* 198 F.3d 725, 730 (9th Cir.1999) (emphasis added).

Here, there was no oral testimony offered at the preliminary injunction hearing, so there was not an opportunity for the Court to judge the credibility of the witnesses. The Order states that the Court "…credited plaintiffs' claims and evidence that Mieras followed plaintiffs to their residence, attempted to intimidate them through verbal and written communication, and trespassed upon Schumacher Furs store." Order at 1. However, plaintiffs never claimed or presented evidence that Mr. Mieras *followed* plaintiffs to their residence, nor did plaintiffs claim or present evidence that Mr. Mieras attempted to intimidate them through *written* communication. Instead, Gregg Schumacher alleged one day prior to the hearing that Mr. Mieras continues to verbally "taunt" him. Supp. Decl. of Gregg Schumacher.

As stated earlier, Mr. Mieras did not have time to respond to this allegation in writing, as Gregg's Schumacher's Supporting Declaration was filed the day prior to the hearing. Mr. Mieras took time off from work to be available at the hearing to provide oral testimony, but the Court did not avail itself of his counsel's offer to call Mr. Mieras to the witness stand. Supp. Aff. of Kevin Mieras. Mr. Mieras responds now that the only comment he recalls directing at Mr. Schumacher in the last several weeks was, "See you next week, Gregg." *Id*. Finally, plaintiffs did claim that Mr. Mieras trespassed upon their store, but they also claimed that as to all of the other named defendants. Plaintiffs offered no

specific information as to Mr. Mieras, and yet the Court enjoined only Mr. Mieras from entering the store.

Plaintiffs never alleged that Mr. Mieras set foot on their residential property or that of their family members or employees, yet he has been enjoined from doing so. Plaintiffs never alleged that Mr. Mieras posted signs on their fur store, yet he has been enjoined from doing so. Plaintiffs never alleged that Mr. Mieras placed any solid or liquid substances on or around their fur store, yet he has been enjoined from doing so. Finally, plaintiffs never alleged that Mr. Mieras ever touched them, their family members or employees, yet he has been enjoined from doing so. For these reasons, and the other reasons stated above, this is a manifest injustice to Mr. Mieras. If any conduct is enjoined, it should be the specific conduct complained of as to this defendant, and shown in accordance with the alternative test for preliminary injunctions. Thus, the Order should be vacated, as Mr. Mieras should not be enjoined from an activity he has never been accused of doing or threatening to do.

F.     **The Balance of Hardships Tips In Favor of Mr. Mieras Because the Order Threatens His First Amendment Rights and the Plaintiffs Presented No Evidence To Support Their Claim of Hardship, Their Lengthy Delay Indicates Such Hardship Is Unlikely, and the End Result Is Manifestly Unjust.**

The hardship evaluation calls upon a court to balance competing claims of injury and the effect that a grant or denial of the injunction would have on the parties. *Los Angeles Memorial Coliseum v. National Football League*, 634 F.2d 1197, 1203-04 (9th Cir. 1980) (reversing the district court's grant of preliminary injunction where the district court failed to consider the hardship to the non-moving party). Where there is insufficient evidence in the record to support a party's asserted hardship, the court may conclude that the demonstrated hardship is minimal when compared to a possible loss of First Amendment freedoms. *Sammartano v. First Judicial District Court*, 3030 F.3d 959, 973-74 (9th Cir. 2002). Moreover, a plaintiff's *lengthy delay* in seeking a preliminary injunction where there has been no change in the relevant factual circumstances "cuts decidedly against a finding of harm or hardship." *Prindable v. Association of Apartment Owners of 2987 KalaKaua*, 304 F. Supp. 2d 1245, 1262 (D. Haw. 2003).

In *Sammartano*, members of certain motorcycle clubs were not permitted into areas of a courthouse without first removing their jackets bearing club insignia. *Sammartano v. First Judicial District Court*, 3030 F.3d 959, 962-63 (9th Cir. 2002). The Ninth Circuit reversed the district court denial of the club's motion for a preliminary injunction enjoining enforcement of the insignia policy. *Id.* at 975. In its balance of hardships analysis, the Ninth Circuit reasoned that enjoining enforcement of the policy imposed only minimal hardship on the government where the government asserted only potential harm without presenting any evidence that the insignia would in fact cause interference or disruption in the courthouse. *Id.* at 973. At the same time, the club members established significant hardship because the policy threatened the loss of First Amendment freedoms. *Id.*

Here, like the club members in *Sammartano*, Mr. Mieras faces significant hardship as a result of this injunction because it threatens his First Amendment freedoms. As explained *supra*, the injunction raises First Amendment concerns because the Court enjoined Mr. Mieras from "directing any form of communication, orally or in writing" to the Schumachers, their family member or employees without considering whether some or all of that communication constituted First Amendment free speech. Order at 2. Moreover, like the government in *Sammartano*, the plaintiffs here have failed to present any evidence to support their claim of hardship. As a result, the balance of hardships tips strongly in favor of Mr. Mieras.

Plaintiffs' delay in seeking an injunction further weakens their claim of hardship. In *Prindable*, the balance of hardships did not favor the party seeking the injunction because the party failed to bring any hardship to the court's attention in the ten months since the legal action commenced or in the five months since the last alleged injury occurred. *Prindable v. Association of Apartment Owners of 2987 KalaKaua*, 304 F. Supp. 2d 1245, 1262 (D. Haw. 2003). Moreover, the non-moving party was able to demonstrate hardship because the requested injunction would have impaired their ability to mount a legal defense in the case. *Id. See also Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985) (holding in a copyright infringement action that the plaintiffs failed to demonstrate irreparable harm

where they waited until ten weeks after discovery of the alleged infringement before seeking an injunction.)

Here, as in *Prindable* and *Citibank*, plaintiffs' lengthy delay cuts against a finding of hardship. Gregg Schumacher alleges that he may have recognized Mr. Mieras' voice outside his home in February 2006, yet waited eighteen months before he sought to enjoin Mr. Mieras from going near his residence. Decl. of Gregg Schumacher; Complaint.  In addition, plaintiffs have not shown a change in relevant factual circumstances since that date.  Though plaintiffs attribute the delay to their inability to secure counsel, that excuse for delay does not demonstrate why they require the extraordinary remedy of a preliminary injunction in order to prevent harm to them during the pendency of this action.  Supp. Decl. of Gregg Schumacher.

A temporary injunction will usually be denied in a doubtful case where it would cause greater harm to an enjoined party who ultimately prevails than the denial of the injunction would cause to the complainant who ultimately prevails.  *Pride v. Community School Bd. of Brooklyn, New York School Dist. No. 18,* 488 F.2d 321 (2d Cir. 1973).  This is especially true when the right is doubtful or money damages are adequate.  *Malnar v. Whitfield*, 1985 OK 82, 708 P.2d 1093 (Okla. 1985).  Saving one party from irreparable injury at the expense of irreparable injury to another ordinarily does not justify preliminary injunctive relief. *Cox v. Northwest Airlines, Inc.*, 319 F. Supp. 92 (D. Minn. 1970).

Mr. Mieras has been attending demonstrations in front of Schumacher Furs since mid-February 2006.  Aff. of Kevin Mieras. The Schumachers waited over one year to seek an injunction against Mr. Mieras, as well as the other protesters.  The fact that they waited so long to seek legal protection from someone they allegedly fear makes it clear that they do not fear Mr. Mieras at all, and they did not show they would suffer any hardship if the injunction did not issue against Mr. Mieras.  Instead, the hardship weighs most heavily on Mr. Mieras.

As addressed *supra*, The Oregonian, as well as other media outlets have closely followed the Schumacher Furs protests.  The Oregonian printed two articles regarding the outcome of the May 17,

2007, hearing as well.  Supp. Aff. of Kevin Mieras; Exhibits D-1 and D-2.  Since Mr. Mieras is the only defendant who has been singled out and enjoined from any conduct, it appears to the general public that he is a person who engages in disorderly and illegal conduct.  *Id.*  This image of Mr. Mieras is extremely misleading and it causes him great stress.  *Id.*  Many of Mr. Mieras' associates read the May 18 Oregonian article, including his employer and some of his friends. *Id.* These people have asked Mr. Mieras about what he did to warrant such an outcome.  *Id.*  This has caused Mr. Mieras shame, humiliation, and mental suffering.  *Id.*  Because Mr. Mieras has been singled out, because he has been enjoined from certain conduct that he never did, was never accused of doing, or never threatened to do, and because of the misperception in the public eye that Mr. Mieras is the only person, in an 18-month-long series of demonstrations, whose conduct warrants an injunction, the Order imposed against him is manifestly unjust, and should be vacated.

### III.    CONCLUSION

Based on the foregoing, Mr. Mieras respectfully requests this Court to grant his Motion for Reconsideration and to vacate the Court's Order dated May 22, 2007.

DATED: May 25, 2007

Jami L. Pannell, OSB #06429
Telephone:  503.768.6848
Facsimile:  503.768.6917
Email:        anmlclin@lclark.edu

Shauna Curphey, OSB #06306
Telephone:  503.295.6400
Facsimile:  503.295.6415
Email:        scurphey@nwcrc.org

Attorneys for Defendant Kevin Mieras